Dwight E. Baker, ISB No. 1350
Jonathan W. Harris, ISB No. 6261
BAKER & HARRIS
266 West Bridge Street
Blackfoot, Idaho 83221
Telephone: (208) 785-2310
Facsimile: (208) 785-6749
E-Mail: jwharris@bakerharrislaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| LILIAN JACKSON; VERONDA MOSHO, ELAINE MCKEAN; MARGIE WHITEHORSE; BLAINE JACKSON; LAVON JACKSON, SR.; LAVON JACKSON, JR.; ABIGAIL RAMSEY and DEBRA BILLY, all individuals,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES OF AMERICA by and through THE DEPARTMENT OF INTERIOR, BUREAU OF INDIAN AFFAIRS; J.W. DUNFORD & ASSOCIATES, INC., an Idaho corporation; JOSEPH WILLIAM DUNFORD; ZACHARY P. MOORE and JOHN DOES 1-10,<br>                    Defendants. | Case No. 4:09-cv-00214-BLW<br><br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT** |

COMES NOW, Plaintiffs Lilian Jackson, Veronda Mosho, Elaine McKean, Margie

Whitehorse, Blaine Jackson, LaVon Jackson, Sr., LaVon Jackson, Jr., Abigail Ramsey, and Debra

Billy, by and through their attorneys of record, Dwight E. Baker and Jonathan W. Harris of the law

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 1**

firm of BAKER & HARRIS, and hereby file their opposition to Defendants J.W. Dunford and

Associates, Joseph William Dunford and Zachary Moore's Motion for Summary Judgment [Docket

# 32].

## I.   STATEMENT OF FACTS

Plaintiffs are members of the Shoshone-Bannock Tribe (herein after "Tribe") who owned 160

acres of trust land identified as SC/4 Section 9, Township 7 South, Range 32 E.B.M., Power County,

Idaho, otherwise referred to as allotment 1486. Plaintiff Lilian Jackson can fairly be characterized

as the lead Plaintiff inasmuch as she was more involved in initiating and completing the instant

transaction than the other Plaintiffs, has a greater financial stake and Plaintiffs agreed that the

deposition testimony of Lilian and her daughter Verona Mosho would be binding on the other

Plaintiffs. *See* Veronda Mosho Depo., p. 52:7-20, attached to the Affidavit of Phillip J. Collaer.[1]

The Plaintiffs inherited this land beginning in the 1950's when Lilian Jackson's father died,

but none of the Plaintiffs ever personally farmed the land. *See* Lilian Jackson Depo., p. 16:3-23;

17:4-15; 18:17-25; 19:1-4. Over the years the BIA leased the land to various farmers and members

of the Jackson family received the lease proceeds. *Id.* p. 18:22-25; 19:1-4; 20:24-25; 21:1-7.

However, for approximately 20 years prior to the sale the land had not been leased or otherwise

utilized to produce income for the Plaintiffs. *Id.* p. 21:14-25; 26:2-22.

Plaintiffs had very little to do with the land because they rely on the BIA to fulfill its legal

responsibility to lease and manage the land. *Id.* p. 23:7-25; 24-26; 27:1-7; *See also*, 25 USC § 415(a);

---

[1] All Depositions taken in this case and deposition exhibits 1-28 are attached to the Affidavit of Phillip J. Collaer. Thus, it was unnecessary for Plaintiffs to submit the same material to the Court and all references to depositions and deposition exhibits in this brief refer the Court to Mr. Collaer's Affidavit.

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 2**

25 CFR § 152. In fact, neither Lilian Jackson nor Veronda Mosho had ever been to the subject

property. *Id.* p. 119:13-15; Veronda Mosho Depo., p. 19:5-12. The Plaintiffs did not have resources

to improve the property and thereby make it more attractive to lessees. Jackson Depo., p. 102:5-11;

Mosho Depo., p. 46:2-16. It is obvious from Lilian's responses to deposition questions that Plaintiffs

lacked the sophistication and resources they would have needed to independently research the value

of the property and otherwise protect their own interest in this matter. Lilian Jackson testified as

follows:

<div style="margin-left:2em">

44
24    Q.  After the family made the decision you
25    were going to sell the property, did you ever
45
1    approach or list the property for sale with a real
2    estate agent?
3        A.  No.
4        Q.  And why not?
5        A.  I don't understand.
6        Q.  Is there any reason why you didn't
7    approach a real estate agent or somebody to help
8    you try to market your property?
9        A.  No.
10       Q.  Did you ever advertise the property
11   for sale?
12       A.  No.
13       Q.  And is there any reason why you
14   didn't?
15       A.  No.
16       Q.  Could you have done that if you had
17   wanted to?  I'm asking just for your
18   understanding.
19       A.  No, I don't think so.
20       Q.  Why not?
21       A.  I don't know.
            ***
49
5   Q.  You didn't talk to a realtor, an
6   accountant, an attorney, anybody of that nature to

</div>

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 3**

7  give you advice about selling your property?

8      A.  No.

9      Q.  Prior to your decision to try to sell

10  the property, did anybody tell you or give you an

11  opinion as to what they thought *(sic)* the value of the

12  property was?

13      A.  No.

14      Q.  Did you do anything to try to research

15  that or find out what the value of the property

16  was at that time?

17      A.  I don't get it.

18      Q.  That's fair.  My understanding of the

19  situation was the family -- you and the family had

20  made a decision that you were going to try and

21  sell the property to raise some cash so you could

22  pay some personal bills.  My question was, through

23  this process of you making that decision that you

24  were going to try and find a buyer, did you do

25  anything to try to find out what the value of the

                            50

1  property was?

2      A.  No.

3      Q.  Okay.  Is there any reason why you

4  didn't do that?

5      A.  I don't understand.

                   ***

25      Q.  Tell me, prior to the time you sold

                            51

1  the property was there any reason you could not

2  have had an appraisal, hire an appraiser, to give

3  you a value for that property?

4      A.  I don't know where to go.

5      Q.  Excuse me?

6      A.  I didn't know where to go to find out

7  the appraisal.

8      Q.  Okay.  You could not look in the phone

9  book, the Yellow Pages, for appraisers?

10      A.  No.

11      Q.  There are appraisers here in

12  Blackfoot, are there not?

13      A.  The BIA told me it costs money to get

14  appraisals.

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 4**

In approximately August 2006, Lilian Jackson had financial obligations she needed to satisfy so she approached BIA regarding selling 160 acres. *Id*. p. 43:2-9. To that end, Lilian went to the local BIA Office at Fort Hall on August 17, 2006 where pursuant to BIA procedures Lilian completed a BIA approved application for sale of Indian land. *Id*. p. 87:1-4; Deposition Exhibit 2; *See* 25 CFR § 152.22 (providing that Indian trust land cannot be sold without BIA approval; 25 CFR § 152.23 (providing that the application to sale trust land must be on a form approved by the BIA). After the Plaintiffs submitted the application they were largely uninvolved in the process and procedure utilized by the BIA and the Tribe for completing the sale of the 160 acres.

In brief, the process utilized by the BIA after receiving applications for sale of trust land generally and the process utilized in this case is as follows. The BIA did a routing sheet to different departments and Tribal Credit to see if the departments had comments and to check for liens against the property. *See* Marge Edmo Depo., p. 14:12-25; 15:23-25; 16:1-3; Deposition Exhibit 3. Lilian Jackson had a lien against her property for money she borrowed from the Tribe. *See* Jackson Depo., p. 115:10-13. Thereafter, the local BIA office requested an appraisal and gathered information pertinent to the 160 acres and forwarded that information to the BIA office in Portland, Oregon. *Id*. p. 16:7-25; *See* 25 CFR § 152.24(requiring the BIA to get a fair market appraisal prior approving the sale of trust land).  Next, there was a waiting period while the BIA had the appraisal done. *Id*. p. 17:2-8.

The BIA received bids to do a total of 130 appraisals on separate parcels of trust land located on the Shoshone-Bannock Reservation, which included Plaintiffs' 160 acres. *See* Phillip Graf Declaration ¶ 15. The BIA awarded the contract to the lowest bidder, namely J.W. Dunford & Associates, Inc. *Id*. at ¶ 's 16 and 17. Joseph Dunford is an appraiser and is owner of J.W. Dunford

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 5**

& Associates, Inc. *See* Joseph Dunford Depo., p. 17:8-20. For these 130 appraisals J.W. Dunford & Associates, Inc., received a total of $67,000, which averages out to $515 per appraisal. Graf Declaration ¶ 16.

In March 2007 when the appraisal at issue was done, Defendant Zachary Moore was employed by J.W. Dunford & Associates, Inc., as a trainee working under Joseph Dunford's supervision. *See* Zachary Moore Depo., p. 15:3-19. Moore did the field work, research and analysis for the appraisal at issue here under Dunford's supervision. *See* Dunford Depo., p. 55:10-25; 56:1-25; 57:1-12.

The appraisal was finished on March 5, 2007 and was then sent the Portland BIA Office where a paper or desk review was done. *See* Phillip Graf Depo., p. 41:9-25; Edmo Depo., p. 19:15-19; Deposition Exhibit #6. Dunford's appraisal concluded that the highest and best use of Plaintiffs' land was as range land and was worth only worth $150 per acre for a total of $24,000. *See* Deposition Exhibit #6. This is in spite of the fact that Plaintiffs' land was previously farmed, had a well on it, much of the land surrounding it was being farmed and the BIA's own internal documents indicated that the highest and best use of the land was as farm land. *See* Graf Declaration ¶ 9, Exhibit B; Frederick Hernandez Depo., p. 48:9-23.

The appraisal was approved without comment by the Portland BIA Office on May 10, 2007. *See* Deposition Exhibit 8. After its approval the appraisal came back to the local BIA Office and a letter was sent to the Plaintiffs informing them of the amount of money they stood to receive under appraisal. *See* Edmo Depo., p. 19:8-14. The actual appraisal was not provided to Plaintiffs until after the transaction was completed. *See* Jackson Depo., p. 60:18-23; 63:6-17. As she does in other cases, Marge Edmo, Realty Officer for the BIA Fort Hall Office, set up a meeting with Tribal Land Use

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 6**

Department to see if the Tribe wanted to purchase the land for the appraised price, assuming the land owner accepts the appraisal amount. At the meeting Edmo and members of Tribal Land Use Department went through the appraisal to make sure the land would bring in enough money to justify the expenditure. *See* Edmo Depo., p. 22:17-25; 23:1-13.

Then the Tribal Land Use Department made a recommendation to the Tribal Council and the Tribal Council, as is typical, accepted the recommendation to purchase the property and adopted a resolution to purchase the property. *Id.* p. 23:14-25; 24:1-3. After the BIA office received the resolution it notified Plaintiffs to come in and sign a deed. *Id.* p. 24:4-10. The BIA completed all paperwork necessary to finalize the transfer of the land. *Id.* p. 20:15-17. Plaintiffs executed deeds which transferred the property on July 2006, 2007. *See* Deposition Exhibit #12.

The Shoshone-Bannock Tribe has a right of first refusal with respect to the sale Indian trust land owned by individual members of the Shoshone-Bannock Tribe. *Id.* p. 25:6-25; 26:1-6. Thus, if someone who is not a member of the Shoshone-Bannock Tribe wanted to purchase trust land from an individual member of the tribe the sale would have to first be offered to the tribe. Because the BIA must approve all sales of Indian trust land, the BIA is in a position to enforce the right of first refusal and does enforce the first right of refusal. *Id.* Edmo testified hypothetically that if a non-Indian perspective purchaser was willing to pay more than what the tribe was willing to pay for trust land the BIA would approve the sale, but she has never seen this happen. *Id.* p. 26:10-25; 27:1-25; 28:1-9.

Lilian Jackson received a copy of the appraisal after the land had been sold and upon reviewing the same she had questions so she turned to Frederick "Sam" Hernandez, a BIA employee who serves as Agricultural Engineer at the Fort Hall Office. *See* Hernandez Depo., p. 12:6-10;

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 7**

Jackson Depo., p. 50:12-24; 64:9-25. Mr. Hernandez questioned whether the appraisal was accurate given that the land had been farmed and was capable of being farmed again so he advised Lilian to speak to the Superintendent Eric LaPoint. *See* Hernandez Depo., p. 48:9-23; Jackson Depo., p. 71:9-15. Lilian addressed her concerns with Mr. LaPoint who indicated that Lilian had already sold the property so nothing would be done. Jackson Depo., p. 72:19-25; 73:1-13. Lilian threatened to sue Mr. LaPoint and he said go ahead because he did not care. *Id*. p. 74:8-16. As her last resort Lilian spoke a Mr. Fisher of the Tribal Council who spoke with Alonzo Coby, Chairman of the Council. *Id*. p. 77:15-23; 78:5-10; 79:7-25. There was discussion about getting another appraisal and Lilian was told that they would get back to her, but no one from the council followed-up with Lilian. *Id*. p. 80:1-17.

After the sale to the Tribe, the land was let out for bid and a farmer named Jeremiah Clark was awarded the bid. To that end Mr. Clark signed a lease with the BIA on April 8, 2008, and thereafter made improvements to the property which has increased its value. *See* Jeremiah Clark Affidavit. After retaining counsel and filing a Notice of Claim with the BIA, Plaintiffs engaged John Chidester to appraise the land. Mr. Chidester indicated that the land appraised for $272,000. *See* Affidavit of Jonathan W. Harris.

Marge Edmo's experience dates back to 1974 when she started working for the BIA in the realty department of the Fort Hall office and Edmo indicates that the tribe always buys Indian trust land and it never goes to non-Indians, although it theoretically could happen. *See* Edmo Depo., p. 10:11-25; 11:1-19; 26:15-22.

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 8**

## II.   SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.

For purposes of summary judgment, the moving party bears the initial burden of proving the absence of material fact issues, and "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Dufay v. Bank of America N.T. & S.A. of Oregon*, 94 F.3d 561, 564 (9th Cir. 1996); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where there are undisputed facts from which different ultimate inferences might reasonably be drawn and as to which reasonable persons might differ, the case is not suitable for summary judgment. *See, e. g., United States v. Diebold*, 369 U.S. 654, 655 (1962) (per curiam); *United States v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970).

## III.   ARGUMENT

Plaintiffs sued Defendants J.W. Dunford and Associates, Joseph William Dunford and Zachary Moore (hereinafter collectively referred to as "Dunford") alleging negligence and third party beneficiary to a contract.  This brief will address only the negligence theory and will address Dunford's argument the Plaintiffs did not suffer any damages.

### A.   Plaintiff's negligence claims are not barred by the economic loss rule

Plaintiffs' negligence claims against Dunford are not barred by the economic loss rule because the special relationship exception applies in this setting.  In Idaho purely economic losses

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 9**

are not recoverable under a negligence theory unless the claim fits within one of two exceptions to purely economic losses. *See Duffin v. Idaho Crop Improvement Ass'n*, 126 Idaho 1002, 1007-1008, 895 P.2d 1195 (1995).

The two exceptions are:

1. The special relationship exception applies when the defendant is a professional, quasi professional or has specialized expertise in a given area and has provided services. For example, were it not for the special relationship exception one would not be able to recover from an attorney, accountant, insurance agent or a real estate appraiser where negligence of the defendant has caused the plaintiff to suffer purely economic loss. *See Nelson v. Anderson Lumber Company*, 140 Idaho 702, 710, 99 P.3d 1092 (2004).

2. "[W]here the occurrence of a unique circumstance requires a different allocation of the risk." *Duffin* at 1007-1008.

Dunford argues that the economic loss rule bars recovery and there is no special relationship between Plaintiffs and Dunford because Plaintiffs did not contract with or otherwise engage Dunford to perform the appraisal. Plaintiffs assert that the special relationship exception applies pursuant to the logic and reasoning found in *Duffin v. Idaho Crop Improvement Ass'n*.

In *Duffin* the plaintiffs sustained purely economic loss when they purchased seed potatoes certified by the Idaho Crop Improvement Association (ICIA). Notwithstanding certification provided the ICIA the seed potatoes contained a disease known as bacterial ring rot which is devastating to a potato crop. *Duffin* at 1005 fn. 3. There was no direct relationship or privity of contract between plaintiff and the ICIA.

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 10**

Nonetheless the Idaho Supreme Court found that the special relationship exception applied because the ICIA

> [H]eld itself out as having expertise in the performance of a specialized function; it is the only entity which can certify seed potatoes in the state of Idaho. ICIA knows that seed is sold at a higher price based on the fact it is certified. Indeed, it has engaged in a marketing campaign, for the benefit of its members, the very purpose of which is to induce reliance by purchasers on the fact that the seed had been certified.

*Id.* at 1008. Likewise, in the instant case Plaintiffs are caught up in a system whereby they have very few choices when it comes to the sale of their trust land.

Pursuant to 25 CFR §§ 152.22 and 152.23 Plaintiffs cannot sell their trust land without BIA approval and the procedure for obtaining approval starts with an application form approved by the BIA. Filing the application sets in motion the following chain of events:

1. The BIA local office requests an appraisal;

2. The appraisal is done;

3. The Indian land owner is informed of how much money they stand to receive but is not given a copy of the actual appraisal;

4. If the Indian land owner accepts the appraisal amount, then the BIA (in this case Marge Edmo) counsels with the Tribe regarding whether the Tribe will purchase the property for the appraisal amount because the Tribe has a right of first refusal.

5. If the Tribe agrees to purchase the property, which it almost always does (according to Marge Edmo), then the BIA will work to finalize the sale.

In theory Plaintiffs can acquire their own appraisal and in theory Plaintiffs can sell the property to a non-Indian if the Tribe will not match the offer. However, rather than what could

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 11**

theoretically occur the Court should focus on what actually happens. What actually happens is that Marge Edmo has worked for the BIA since 1974 and has never seen a situation where a non-Indian has purchased the property. *See* Edmo Depo., p. 11:1-19; 26:15-22.

Why the Plaintiffs did not get their own appraisal and otherwise do more to maximize value out of their land, is easily understood upon examining Plaintiffs' deposition testimony. Plaintiffs lack the sophistication, resources and knowledge to take these sort of measures. Rather, the Plaintiffs as dependant trust beneficiaries rely on the BIA to fulfill its fiduciary obligation to protect their interest. *See Cobell v. Norton*, 240 F.3d 1081, 1100 (D.C.Cir. 2001)(explaining that "the relationship between Indians and the federal government was like 'that of a ward to his guardian'" and that "'Indian tribes are the wards of the nation'")(citations omitted).

First, Plaintiffs are caught up in a system and scheme whereby they rely on Dunford to perform a specialized function, namely the appraisal. Dunford argues that Plaintiffs did not rely on the appraisal because they did not receive a copy until after the sale. However, the undisputed facts show that Plaintiffs relied on the single most important part of the appraisal, namely the amount. The amount is communicated to Plaintiffs after the appraisal comes back to see if Plaintiff will accept the appraisal amount. *See* Edmo Depo., p. 19:8-14. Thus, Plaintiffs did rely on Dunford's performance of a specialized function.

Second, Dunford holds himself out as having the expertise to perform this specialized function when he submits a bid to the BIA to perform appraisals of Indian trust land because the BIA looks at an appraiser's geographic and subject matter competency when selecting an appraiser. *See* Graf Depo., p. 35:5-14.


**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 12**

Third, Joseph Dunford knows that the BIA has a fiduciary duty to manage Indian Trust land and Mr. Dunford has substantial knowledge regarding reservation lands. *See* Dunford Depo., p. 66:16-22; 32:1-13. During the last eight years Dunford has completed appraisal contracts on four different Indian reservations[2] and has completed between 10 and 20 appraisal contracts on the Shoshone-Bannock Reservation alone. *Id.* p. 32:14-25; 33:1-13. Each contract involves multiple appraisals, for example the contract under which Dunford appraised Plaintiffs' 160 acres included 130 appraisals on separate parcels. Graf Declaration ¶ 14. It is fair to say that Dunford has appraised hundreds if not thousands of parcels on the Shoshone-Bannock Reservation. Finally, Dunford testified that it is important to know whether the appraisal objective is to determine fair market value for sale or fair rental value for lease because there are a lot of differences between the two types of appraisals. Dunford Depo., p. 36:17-25; 37:1-24. Thus, Dunford knew that the appraisal of Plaintiffs' land would be used in conjunction with a sale or a potential sale.[3]

Dunford's arguments fail to recognize the overriding concern in this case which is that Plaintiffs are dependant beneficiaries. As dependant beneficiaries Plaintiffs lacked the sophistication, skill and resources to effectively market their property in a fashion which is likely to yield a maximum purchase price. For that reason Plaintiffs are reliant and dependant upon the BIA who acts as trustee. Dunford had extensive experience appraising trust land on several Indian

---

[2] Those reservations include Crow, Wind River, Nez Pierce and Shoshone-Bannock.

[3] Zachary Moore and Joseph Dunford disagree on this important point as Moore testified that he did not know that the appraisal was for a potential sale and it did not matter because he would not have done the appraisal any different if he had known. *See* Moore Depo., p. 32:7-9; 34:21-24. Since Moore essentially did the appraisal notwithstanding his lack of experience, this may account for the problems with the appraisal.

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 13**

reservations in the western United States. Thus, Dunford knew how the system works and knows that dependant beneficiaries will rely indirectly upon his appraisal when they sale their trust land. Thus, by virtue of the fiduciary relationship between Plaintiffs and the BIA, Dunford stepped into the shoes of the BIA when performing the appraisal which was the BIA's fiduciary obligation to acquire. Thus, a special relationship has been formed.

Based on the foregoing the Court should find a special relationship pursuant to *Duffin* because: Dunford performed the appraisal (i.e. specialized function) which he had to know Plaintiffs would rely on in combination with the fact the Plaintiffs were not able to get their own appraisal and the fact that the BIA has a fiduciary obligation to manage Indian trust land. *See Ramerth v. Hart*, 133 Idaho 194, 198, 983 P.2d 848, 852 (1999)(noting that "there may be cases where the plaintiff may be unfairly prejudiced by the operation of the economic loss rule in combination with the privity requirement").

### B.       Plaintiffs' did suffer damages as a result of Dunford's negligence

First, Dunford argues that Plaintiffs did not rely on the appraisal. Plaintiffs did rely on the appraisal amount as explained above. Marge Edmo would not go to the Tribe to see if the tribe wanted to purchase the land until the land owner has agreed to accept the appraisal amount.

Second, Dunford argues that the Tribe never would have purchased the land for the amount of Plaintiffs' appraisal, namely $272,000. There is no way of knowing what the Tribe would have purchased the property for because no one who speaks on behalf of the Tribe testified in this case. Dunford cites Marge Edmo's deposition testimony for this proposition, but Edmo is a BIA employee who cannot speak for the Tribe. Even if Edmo could speak for the Tribe, Plaintiffs were not limited to only selling the property to Tribe. The Tribe has a right of first refusal and if the Tribe was

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 14**

unwilling to match the offer of another person or entity then Plaintiffs could have sold the land to elsewhere for the best price. *See* Edmo Depo., p. 34:3-21.

Third, Dunford mis-characterizes Lilian Jackson's deposition testimony. Lilian simply agreed that all things being equal, farm land which was developed and had improvements would be worth more than undeveloped, unimproved farm land. *See* Jackson Depo., p. 70:20-25; 71:1-16. Lilian did agree that the property was only worth

Finally, if as Plaintiffs allege the property was worth $272,000 then it is inconceivable that they have not suffered damages because it is likewise inconceivable that Plaintiffs would not have received more than $24,000 for their property, whether from the Tribe or another party. In essence Dunford's argument on this point is simply a back door attempt to claim that Dunford's appraisal is more accurate which is an argument for trial, not summary judgement.

## IV.    CONCLUSION

For reasons set forth above there is a special relationship between Plaintiffs and Dunford which requires that Dunford's Motion for Summary Judgement be denied.

DATED this _24_ day of November, 2010.

BAKER & HARRIS

Jonathan W. Harris

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 15**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the _24_ day of November, 2010, the within and foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the Bankruptcy Court's CM/ECF filing system, and upon such filing the CM/ECF registered participants in this case were served by electronic means.

Phillip J Collaer
pcollaer@ajhlaw.com, mdonnelly@ajhlaw.com,clong@ajhlaw.com

Robert C Grisham
Robert.Grisham@usdoj.gov,Karen.Sellman@usdoj.gov,janis.malm@usdoj.gov,Pamela.Hamlin@usdoj.gov,usaid.ecfnotice@usdoj.gov

Jonathan W. Harris

**PLAINTIFFS' RESPONSE TO DEFENDANTS J.W. DUNFORD AND ASSOCIATES, JOSEPH WILLIAM DUNFORD AND ZACHARY MOORE'S MOTION FOR SUMMARY JUDGMENT - 16**